UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
                                                        :
ALBA LUZ CARELA ROSA                                    :
                                                        :
                        Plaintiff,                      :          OPINION AND ORDER
                                                        :
                -against-                                :          18 Civ. 2926 (GWG)
                                                        :
COMMISSIONER OF SOCIAL SECURITY,                        :
                                                        :
                        Defendant.                      :
                                                        :
------------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

        Plaintiff Alba Luz Carela Rosa ("Carela") brings this action pursuant to 42 U.S.C.

§ 405(g) for judicial review of the final decision of the Commissioner of Social Security (the

"Commissioner") denying her claim for Supplemental Security Income and Disability Insurance

Benefits under the Social Security Act (the "Act").  Both parties have moved for judgment on

the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[1]  For the reasons stated below,

Carela's motion for remand is granted in part and denied in part, and the Commissioner's motion

is granted in part and denied in part.

I. BACKGROUND

        A.  Procedural History

        Carela applied for Disability Insurance Benefits ("DIB") on July 10, 2014.  See Certified

---

        [1]  See Notice of Motion, filed Sept. 10, 2018 (Docket # 13); Memorandum of Law in
Support of Plaintiff's Motion for Judgment on the Pleadings, filed Sept. 10, 2018 (Docket # 14)
("Pl. Mem."); Notice of Motion, filed Dec. 13, 2018 (Docket # 19); Memorandum of Law in
Support of Defendant's Motion for Judgment on the Pleadings and in Opposition to Plaintiff's
Motion for Judgment on the Pleadings, filed Dec. 13, 2018 (Docket # 20) ("Def. Mem.");
Plaintiff's Reply Memorandum, filed Dec. 31, 2018 (Docket # 21) ("Pl. Reply"); Reply
Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings, filed
Feb. 22, 2019 (Docket # 24) ("Def. Reply").

Administrative Record, filed July 9, 2019 (Docket # 11) ("R."), 217-23.  On July 14, 2014,

Carela applied for Supplemental Security Income ("SSI").  R. 224-32.  In both applications, she

alleged that her disability began on June 3, 2014, when she was 49 years old.  See R. 217, 224.

The Social Security Administration ("SSA") denied the applications, R. 75-76, 93-97,

and Carela sought review by an Administrative Law Judge ("ALJ"), R. 101-09.  The hearing was

held, via video teleconferencing, on June 13, 2016, before ALJ Sheila Walters, who was located

in Stockton, California.  R. 43, 45.  Carela testified from the Bronx, New York, and was

represented at the hearing by Edward Rao, an attorney.  R. 44-45.  An interpreter was also

present with Carela.  R. 45.  In a written decision dated September 2, 2016, the ALJ found

Carela not disabled within the meaning of the Act.  R. 19-41.  On February 13, 2018, the

Appeals Council denied Carela's request for review of the ALJ's decision, making the ALJ's

decision the final decision of the Commissioner.  R. 3-10.  This action followed.

B.  The Hearing Before the ALJ

Carela was represented by attorney Edward Rao at her hearing.  R. 45.  At the very

beginning of the hearing, the ALJ asked Carela whether Carela could "understand most of what

[the ALJ was] saying."  R. 45.  The ALJ stated that the hearing "could . . . proceed a little faster"

if Carela could understand the ALJ without the assistance of an interpreter.  See R. 45.  Carela

indicated that she could understand "very little" of what the ALJ was saying.  R. 45.

When asked by the ALJ whether the record was complete, Rao indicated that Carela had

just given him a prescription list that he would submit after the hearing, and that he was

uncertain that the record contained all records from Carela's treating primary care physician Dr.

Comas-Espinal.  R. 45-46.  Rao stated that he "want[ed] to make sure that the opinion evidence

is backed up by treatment records," and expressed concern that there were only "six pages of

handwritten notes in addition to the impairment questionnaire" from Dr. Comas-Espinal in the record at the time of the hearing. R. 46-47. The ALJ agreed to hold the record open for two additional weeks. R. 47.

At the hearing, Carela testified that she was born on April 3, 1965, and was 51 years old. R. 49. She was five foot one inch tall, weighed 135 pounds, and was right-handed. R. 49. She was single with no dependent children under the age of 18, and lived in an apartment with her adult niece. R. 49-50. She walked to the hearing that day. R. 50. She completed twelfth grade, but stated that she "did not graduate." R. 50. She obtained a vocational certificate in manicure, pedicure, and hairstyling 27 years before the hearing. R. 50. When asked whether she could "read and write in English," Carela responded "[v]ery little." R 50. Carela stated that she has been on Medicaid since approximately 1996 or 1997 and receives food stamps, but denied having filed for worker's compensation or unemployment insurance. R. 51. Carela testified that she spends the day lying down and then getting up, and stated that her only hobby is watching television. R. 52. Her niece and daughter-in-law do her laundry and housework and cook, and her niece does the grocery shopping. R. 52.

Carela denied working at the time of the hearing, but stated that she was self-employed performing manicures and pedicures in 2001 and 2003. R. 52-53. She did not recall whether she was working during the years of 2005, 2006, and 2007, which showed earnings. R. 53. She attributed earnings in 2009, 2010, and 2011, to self-employment performing manicures and pedicures. R. 53-54.

Carela testified that she stopped working because of her "leg and [her] back." R. 54. She has not looked for work since her alleged disability onset date and has not attended vocational rehabilitation programming. R. 54-55. The ALJ inquired about evidence concerning Carela's

leg, and Rao indicated that he did not believe that there was any objective evidence of leg injury in the record at the time of the hearing. R. 55. Carela testified that she has herniated discs, and that her doctor has advised that she needs surgery. R. 55-56. With respect to her leg, Carela indicated that her doctor says she has "damaged nerves because the disc pinched it" and that she has "cramps." R. 56. Carela also testified that she has pain and cramps in her hands, "just like [her] foot." R. 56. The ALJ remarked that the was "nothing in the record" with respect to Carela's "hands or the feet," and Rao directed her to Dr. Alberto Comas-Espinal's progress notes diagnosing carpal tunnel syndrome, R. 56, and noted that "we are looking for his full treatment notes." R. 56-57.

Carela testified that she sees Dr. Comas-Espinal monthly, and that she takes Oxycodone, Naproxen, and Zolpidem "to sleep." R. 57. She also stated that she used a "cream," and did not recall whether she took other medications. R. 57. Carela stated she could walk for one block, or for twenty to twenty-five minutes. R. 57-58. She stated that in an eight-hour day with normal breaks, she would be able to walk for a total of half an hour. R. 58. She testified that she could stand at one time for fifteen to twenty minutes, and could sit for approximately twenty to thirty minutes at a time. R. 58. She could lift a gallon of milk, but not two gallons of milk. R. 58. Carela denied having breathing problems, smoking, drinking, or using substances, but noted that she had prescribed glasses. R. 59.

During an examination by her attorney, Carela testified that her medications make her "[d]izzy the next day," and affirmed that they make her "very dizzy." R. 59. She is unable to touch her toes. R 59. While she has no trouble with her right hand, she has had problems with her left hand, and could not open a jar with her left hand. R. 60. She denied being able to type. R. 60. Carela denied having trouble dressing herself, but noted that she "[s]ometimes" has

trouble getting in and out of the shower, R. 60, because of "strong pain in her back" and leg, R. 61. She denied being able to reach overhead with her arms. R. 61. Carela affirmed that she walked to the hearing, and noted that lives half a block away from the hearing office. R. 60. Carela explained that she could not return to her previous work "in the hair salon" because of "[t]he standing up" required. R. 61. She also noted that her pain affects her ability to concentrate, and that she "[s]ometimes" has issues with her memory. R. 61.

The ALJ then heard testimony from a vocational expert ("VE"), Daniel Wolstein. The VE first identified Carela's past relevant work experience as manicurist, with a Dictionary of Occupational Titles ("DOT") code of 331.674-010.[2] R. 63. The VE confirmed, per the ALJ's question, that the position was sedentary as performed. R. 63. After Rao questioned this classification, and given Carela's testimony that she would have to stand at her job "in the hair salon," R. 61, 63, the ALJ asked Carela follow-up questions about her work. The ALJ asked Carela how many hours she would stand per day when she was "doing the manicurist job," and Carela responded "10 to 12 hours." R. 64. When the ALJ followed up for clarification because "manicurists usually sit to do a manicure," Carela clarified that she "used to wash hair at the salon, too," and also noted that she used to "put rollers on the hair." R. 64. The VE then identified this position as "hairstylist," with a DOT listing of 332.271-018, classified the hairstylist position as light duty, R. 64, and noted that it was also light duty as performed, R. 65.

The ALJ then posed several hypothetical questions to the VE. The ALJ first asked the VE to "assume a hypothetical individual of the same age, education, and work experience as the claimant," who also has following limitations: the ability to lift and carry ten pounds frequently

---

[2] The VE also identified babysitter as a job, but the ALJ chose not to count that as past relevant work because it was not performed at the level of substantial gainful activity. R. 63.

and twenty pounds occasionally; the ability to sit for six hours in an eight hour work day; the ability to stand and/or walk for six hours in an eight hour workday; the inability to ever climb ladders, ropes, or scaffolds; and the ability to only occasionally climb ramps and stairs, and to only occasionally stoop, kneel, crouch, and crawl. R. 65-66. The VE testified that such an individual would be able to perform Carela's past work as a manicurist or a hairstylist. R. 66. The ALJ then asked the VE whether either the manicurist or hairstylist job had transferrable skills, and, after discussing transferrable skills, the VE identified the position of "fingernail former," DOT code 331.674-014, with 83,840 jobs in the national economy, as the only position that used transferrable skills from either position. R. 67. In addition, the VE testified that the hypothetical individual could perform the jobs of toll collector (DOT code 211.462-038), cleaner/housekeeping (DOT code 323.687-014), and chaperone (DOT code 359.667-010). R 68.

Rao then asked the VE whether the jobs available would be affected if the hypothetical individual was "limited to only occasional gross and fine manipulative movements with the non-dominant hand." R. 69. The VE confirmed that the chaperone position could still be performed, but the others could not. R. 70. In response to a further question from Rao regarding the allowable amount of time off-task, the VE proffered that based on his professional observations, an individual could be off task "up to ten percent of the day," and could be absent from work one day per month. R. 70. Rao then asked the VE to assume that the hypothetical individual could only sit for a total of two hours and stand and/or walk for two hours, and the VE confirmed that none of the jobs the ALJ mentioned, including past relevant work, would be available on a full-time basis. R. 71.

Rao then asked Carela additional questions about her consultative examination with Dr. Marilee Mescon. R. 71. Carela testified that Dr. Mescon spent ten minutes with her during the

examination, and confirmed that she saw the doctor only once. R. 71. As a closing, Rao asked that the consultative examination by Dr. Mescon be given "little to no weight for lack of treatment and only having seen the client for ten minutes," which he did "not believe to be enough to properly assess the client's residual functional capacity." R. 72. Rao next discussed the difficulty of applying the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as the "grids"), in this case, because "there's no grid for somebody who is a younger individual, illiterate or unable to — well she is unable to communicate effectively in English and yet there's no grid rule for someone with those two characteristics, but also someone who has skilled or semi-skilled past relevant work." R. 72. Rao offered that the ALJ could use grid 201.17, but said he left "that open as a question for the Court." R. 72. The ALJ noted that grid rules 202.11 or 202.12 seemed to be appropriate. See R. 73. The ALJ then followed up with Carela about whether she finished high school, and Carela stated that she "did finish [high school] in the Dominican Republic" but that she didn't know where her high school diploma was. R. 73.

C. The Medical Evidence

Both Carela and Commissioner have provided summaries of the medical evidence contained in the administrative record. See Pl. Mem. at 2-7; Def. Mem. at 4-9. The Court had directed the parties to specify any objections they had to the opposing party's summary of the record, see Scheduling Order, filed July 18, 2018 (Docket # 12), ¶ 5, and neither party has done so. See Def. Mem.; Pl. Reply. Defendant states that the defendant's brief "supplements Plaintiff's summary of the administrative record." Def. Mem. at 1. Accordingly, the Court adopts the parties' summaries of the medical evidence as accurate and complete for purpose of the issues raised in this suit. We discuss the medical evidence pertinent to the adjudication of

this case in Section III below.

    D.  <u>The ALJ's Decision</u>

The ALJ denied Carela's application for DIB and SSI on September 2, 2016. R. 25-37. Following the five-step test set forth in the SSA regulations, the ALJ first found that Carela met the insured status requirements and had not engaged in "substantial gainful activity since June 3, 2014, the alleged [disability] onset date." R. 27-28. At step two, the ALJ found that Carela had the following severe impairment: "degenerative disk disease status post 2001 and 2002 corrective surgery." R. 28. The ALJ also noted that Carela had the nonsevere impairments of carpal tunnel syndrome and high blood pressure. R. 28. With respect to Carela's carpal tunnel syndrome, the ALJ noted that it "was not diagnosed until May 2016," and that a note included in Carela's medical records consisted of "a generic description of carpal tunnel syndrome, not the claimant's own symptoms." R. 28. The ALJ concluded that because "[a] review of the record revealed no continuous 12 months of complaints regarding the use of her hand," and because "the claimant should respond to treatment for carpal tunnel syndrome," the impairment was non-severe. R. 28. With respect to Carela's high blood pressure, the ALJ noted that "treatment appears has relived [sic] the condition," and "no acceptable medical source has specifically attributed any functional limitations specifically to high blood pressure," making the impairment non-severe. R. 28.

    At step three, the ALJ concluded that none of Carela's severe impairments singly or in combination met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). R. 28. The ALJ specifically considered Listings 1.02 and 1.04 in determining that Carela did not exhibit the necessary medical criteria. R. 28-29.

Before moving to step four, the ALJ assessed Carela's residual functional capacity

("RFC").  R. 29-34.  The ALJ determined that Carela retained the RFC "to perform light work" with the following limitations:

> she can, at most: lift and carry twenty pounds occasionally, and ten pounds frequently; sit for six hours in an eight-hour workday; stand and walk for six hours in an eight-hour workday; and occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs.  The claimant cannot ever, however, climb ladders, ropes, or scaffolds.

R. 29.  The ALJ considered Carela's allegations that "spinal pathologies and left-leg numbness prohibit [her] from working," and the additional functional limitations that she alleged.  R. 30.  However, the ALJ concluded that based on her review of the record, Carela's "alleged impairments, and the limitations they impose upon her capacities to perform regular and sustained work, cannot be wholly accepted."  R. 30.

In reaching this conclusion, the ALJ noted that "[o]bjective signs and laboratory testing have confirmed" the conditions alleged by Carela.  R. 30.  She noted that "a nerve conduction study in May 2016 confirmed both spinal radiculopathy . . . and right-side carpal tunnel syndrome," R. 30 (citing R. 414, 419), and that "Dr. Comas-Espinal further observed the claimant with a limited spinal range of motion," R. 30 (citing R. 431).  However, the ALJ concluded that "the objective medical evidence does not establish physical limitations of a severity consistent with the claimant's alleged impairments."  R. 30 (emphasis in original).  The ALJ focused in particular on the findings of a consultative examination performed in September 2014 by Dr. Marilee Mescon, who "noted that the claimant presented with a wholly normal gait and station," found that Carela "was able to achieve full flexion, extension, bilateral lateral flexion, and bilateral rotary movements in her lumbar spine" and in her cervical spine, and "found no scoliosis, kyphosis, or abnormality in the claimant's thoracic spine."  R. 31 (citing R. 315-18).  Dr. Mescon also found, upon musculoskeletal testing, that Carela "revealed full range

of motion throughout," and that Carela's "joints were further stable and non-tender," and that her "deep-tendon reflexes were fully . . . intact." R. 31. The ALJ also noted that while "Dr. Mescon did find some diminished strength in the claimant's lower extremities, the claimant still demonstrated substantial strength in those areas ('3/5'), and showed full and unimpaired strength in her bilateral upper extremities." R. 31. The ALJ noted that Dr. Mescon's findings "have further been replicated elsewhere," citing an examination performed by Dr. Comas-Espinal in September 2014. R. 31 (citing R. 428). The ALJ also found that Carela "herself has even denied some of her most relevant symptoms," citing notes from a September 2015 appointment with gastroenterologist Lincoln Hernandez in which Carela "<u>denied</u> arthritis, back pain, joint pain, muscle weakness, or stiffness." R. 31 (emphasis in original) (citing R. 382).

The ALJ also noted that the record was missing "medical records that one would expect from conditions as debilitating as the claimant alleges." R. 31. While the record did "contain the aforementioned irregular nerve condition study," R. 31 (citing R. 422-55); Dr. Comas-Espinal's observation of limited spinal range of motion, R. 32 (citing R. 431); "and notations of edema," R. 32, the ALJ explained that "besides these records, the evidence is largely devoid of objective documentation of either carpal tunnel syndrome, or degenerative disc disease." R. 32. The ALJ noted that it was "[e]specially noticeable, [that] the record does not contain radiographs actually visualizing any degenerative changes." R. 32.

The ALJ next considered other evidence that the ALJ concluded undercut the credibility of Carela's allegations of the severity of her symptoms. The ALJ cited Carela's "own reported functionality," her non-compliance with physical therapy treatment, observations recorded by Social Security field office representatives, and Carela's work history, which the ALJ believed "does not demonstrate a strong motivation to work." R. 32. The ALJ also noted that Carela's

alleged RFC was inconsistent with the Dr. Mescon's opinion, which the ALJ deemed to be "the most credible medical opinion[] of record." R. 32. Finally, the ALJ considered the medical opinions of record. The ALJ assigned "great weight" to the opinion of Dr. Mescon, the physiological consultative examiner, and "little weight" to the opinion of treating source Dr. Comas-Espinal. R. 33.

At step four, the ALJ concluded that Carela could not perform her past relevant work of manicurist/hairstylist. R. 34. The ALJ then moved to step five. The ALJ noted that while Carela was a "younger individual" on the alleged disability onset date, she changed age category to "closely approaching advanced age," R. 34-35, and observed that Carela had acquired work skills from past relevant work, R. 35. The ALJ also concluded that Carela "has a high school education," and that she "is able to communicate in English." R. 35. On the latter point, the ALJ noted that "[a]lthough an interpreter communicated the hearing to the claimant in Spanish, she testified that she can read and write 'a little' English," and that "[m]any of the claimant's treatment records further indicate that the claimant's preferred language is 'English.'" R. 35 (citing R. 422, 423, 424, 426). The ALJ then concluded that based on the testimony of the VE, there were jobs in the national economy Carela could perform and thus that she was not disabled. R. 36.

## II. GOVERNING STANDARDS OF LAW

### A. Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d

370, 374-75 (2d Cir. 2015) (per curiam); <u>see</u> <u>generally</u> 42 U.S.C. § 405(g) ("The findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive . . . ."). Substantial evidence is "'more than a mere scintilla. It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Richardson</u>

<u>v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229

(1938)); <u>accord</u> <u>Greek</u>, 802 F.3d at 374-75; <u>Burgess v. Astrue</u>, 537 F.3d 117, 127-28 (2d Cir.

2008); <u>Matthews v. Leavitt</u>, 452 F.3d 145, 152 n.9 (2d Cir. 2006); <u>Shaw v. Chater</u>, 221 F.3d 126,

131 (2d Cir. 2000). The "threshold for such evidentiary sufficiency is not high." <u>Biestek v.</u>

<u>Berryhill</u>, 139 S. Ct. 1148, 1154 (2019).

"Even where the administrative record may also adequately support contrary findings on

particular issues, the ALJ's factual findings must be given conclusive effect so long as they are

supported by substantial evidence." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (per

curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds

substantial evidence to support the Commissioner's final decision, that decision must be upheld,

even if substantial evidence supporting the claimant's position also exists." <u>Johnson v. Astrue</u>,

563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing <u>Alston v. Sullivan</u>, 904 F.2d 122, 126 (2d Cir.

1990)). The Second Circuit has characterized the substantial evidence standard as "a very

deferential standard of review — even more so than the 'clearly erroneous' standard." <u>Brault v.</u>

<u>Soc. Sec. Admin., Comm'r</u>, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). "The substantial

evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a

reasonable factfinder would <u>have to conclude otherwise</u>." <u>Id.</u> (emphasis in original) (citations

and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited

and substantial deference is to be afforded the Commissioner's decision." <u>Johnson</u>, 563 F. Supp.

2d at 454 (citations and internal quotation marks omitted). Importantly, it is not a reviewing court's function "to determine de novo whether [a claimant] is disabled." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation marks omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).

B. Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see id. § 1382c(a)(3)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial

gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his or her age, education, or work experience. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d).  Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work."  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC, in addition to his or her age, education, and work experience, permits the claimant to do other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

III.  DISCUSSION

Carela raises five grounds for reversing the ALJ's decision, arguing that: (1) the ALJ failed in her affirmative duty to develop the record, Pl. Mem. at 15-17; (2) the ALJ failed to

follow the treating physician rule, id. at 9-15; (3) the ALJ failed to properly assess Carela's credibility and symptoms, id. at 18-20; (4) the ALJ failed to properly evaluate the severity of Carela's carpal tunnel syndrome, id. at 17-20; and (5) the ALJ misapplied the Medical-Vocational rules, failing at her step five burden, because she improperly determined that Carela could speak English, id. at 20-22. We address these issues next, except that we do not reach the treating physician and credibility issues because we find that the record was not properly developed.

A.   Duty to Develop the Record

When an ALJ assesses a claimant's alleged disability, an ALJ must develop the claimant's medical history for at least a 12-month period. 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1512(d), 416.912(d) (2017);[3] see Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) ("The ALJ has an obligation to develop the record in light of the non-adversarial nature of the benefits proceedings . . . .") (citing cases); accord Sims v. Apfel, 530 U.S. 103, 111 (2000) (ALJ has a "duty to investigate the facts and develop the arguments both for and against granting benefits"). The governing statute provides that the ALJ "shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make" the disability determination. 42 U.S.C. § 423(d)(5)(B); accord 20 C.F.R. §§ 404.1512(d), 416.912(d). The regulations define this as, at a minimum, "the records of [a claimant's] medical source(s) covering at least the 12 months preceding the month in which" a claim is filed. 20 C.F.R.

---

[3]   These regulations were amended by the SSA, effective March 27, 2017. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 F.R. 5844-01 (Jan. 18, 2017), 2017 WL 168819. Because Carela's claim was filed before March 27, 2017, the old version of the regulations apply. See id.

15

§§ 404.1512(d)(2), 416.912(d)(2). "Every reasonable effort" means that the Social Security Administration must:

> make an initial request for evidence from [a claimant's] medical source and, at any time between 10 and 20 calendar days after the initial request . . . make one follow-up request to obtain the medical evidence necessary to make a determination. The medical source will have a minimum of 10 calendar days from the date of [the SSA's] follow-up request to reply, unless [the SSA's] experience with that source indicates that a longer period is advisable in a particular case.

Id. §§ 404.1512(d)(1), 416.912(d)(1); accord Assenheimer v. Comm'r of Soc. Sec., 2015 WL 5707164, at *15 (S.D.N.Y. Sept. 29, 2015). The ALJ's duty to develop the record remains the same regardless of whether the claimant is represented by counsel. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999) (citing Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996)); accord Cancel v. Colvin, 2015 WL 865479, at *5 (S.D.N.Y. Mar. 2, 2015) (citing cases). Where the ALJ fails to develop the record, remand is appropriate. Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir. 1999).

At the same time, it is well established that "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa, 168 F.3d at 79 n.5 (citing Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996)); accord Perez, 77 F.3d at 48 (where the ALJ had "already . . . obtained and considered reports" from treating physicians, the ALJ "had before him a complete medical history, and the evidence received from the treating physicians was adequate for him to make a determination as to disability").

Carela argues, inter alia, that the ALJ failed to develop any evidence from Dr. Agueda Mercado, who is identified as the referring physician in Carela's physical therapy records. Pl. Mem. at 16 (citing R. 335). The only record of Carela relating to Dr. Mercado is a physical

therapy record dated November 30, 2015, which lists Dr. Mercado as the referring physician, and indicates that Carela informed the physical therapist that she last saw Dr. Mercado on November 23, 2015, and that at that appointment Dr. Mercado prescribed medication and referred her to physical therapy. R. 335. The Commissioner argues that because Carela "never identified Dr. Mercado as a treating source, and indeed asserted that Dr. Comas-Espinal was her only treating source at Wadsworth Medical Group," where Dr. Mercado also works, see Def. Mem. at 17, and because the ALJ "received copious records from the Wadsworth Medical Group," Carela "has not actually demonstrated that any records are missing from Wadsworth Medical Group," id. The Commissioner further argues that the "Wadsworth records [contained in the administrative record] include[] the November 23, 2015 chart note for that office visit." Def. Reply at 8.

The Commissioner is correct that Carela did not list Dr. Mercado as a treating source in her initial application for benefits. See Pl. Mem. at 17 (citing R. 254). With respect to Carela's alleged assertion at the hearing that "Dr. Comas-Espinal was her only treating source at Wadsworth Medical Group," Carela's then-attorney Rao stated that "we have one treating primary care physician, Dr. Comas-Espinal." R. 46 (emphasis added). Rao did not assert that Dr. Comas-Espinal was Carela's only doctor at Wadsworth. And indeed the citation to Dr. Mercado's biographical page on Wadsworth Medical Group's website, which the Commissioner cites, Def. Mem. at 17, indicates that Dr. Mercado practices internal medicine. While the record does contain a record from Wadsworth Medical Center dated November 23, 2015, which the Commissioner cites, Def. Reply at 8 (citing R. 441), the cited record documents an office visit with Dr. Comas-Espinal, not Dr. Mercado, R. 441. There is no mention of a visit with Dr. Mercado on that day, and there is no indication that Dr. Comas-Espinal or any other doctor at Wadsworth referred Carela for physical therapy on that day. R. 441. While the Commissioner

17

correctly points out that there are numerous records from Wadsworth Medical Group, Carela is also correct that "[i]t is not clear that a request to Wadsworth Medical Group specifically identifying only Dr. Comas-Espinal as the target source for evidence would produce records from any other provider seen at the facility." Pl. Reply at 5.

This case is distinguishable from the cases that the Commissioner cites in support of the proposition that Carela "has not actually demonstrated that any records are missing from Wadsworth Medical Group." Def. Mem. at 17. In <u>Morris v. Berryhill</u>, 721 F. App'x 25 (2d Cir. 2018), the claimant asserted that three records from a treating source may have been missing. <u>Id.</u> at 27-28. But, in that case, the treating source had already received and responded to a document request from the SSA, and the claimant argued that "the ALJ had a duty to recontact [the doctor at issue] to obtain any outstanding records or clarification as of February 2013 before discarding his opinion." <u>Id.</u> at 27. Here, the issue is not re-contacting Dr. Mercado. Rather, the Commissioner has not pointed to anything in the record suggesting that any documents were ever requested from Dr. Mercado. Similarly, in <u>Reices-Colon v. Astrue</u>, 523 F. App'x 796 (2d Cir. 2013), the claimant argued that the ALJ "should have sought to supplement the record with additional files" from a treating source, from whom records had already been obtained. <u>Id.</u> at 799. Here, there is no indication that the ALJ ever requested any documents from Dr. Mercado, and the evidence in the record indicates that there may be missing records from a November 23, 2015, visit with Dr. Mercado at Wadsworth. <u>Bushey v. Colvin</u>, 607 F. App'x 115 (2d Cir. 2015), is inapplicable, as the allegations in that case were that the ALJ failed to develop the record by declining to order an IQ test for the plaintiff and by declining to consider records developed in a previous claim for benefits. <u>See id.</u> at 115-16 (citing <u>Bushey v. Colvin</u>, 2014 WL 4854984 (N.D.N.Y. Sept. 30, 2014)); <u>Bushey</u>, 2014 WL 4854984, at *2 (summarizing plaintiff's

arguments).

Carela also argues that the ALJ did not discharge her duty to develop the record because the ALJ failed to obtain two potential MRI reports, from 2012 and March 2015. Pl. Mem. at 16. The September 2014 notes of consultative examiner Dr. Mescon indicate that Carela orally informed the doctor that she "had an MRI done of her back two years ago." R. 315. On November 30, 2015, Carela orally informed her physical therapist that she underwent an MRI in March 2015, "which revealed lumbar disc herniation." R. 335. Additionally, in the "Spinal Impairment Questionnaire" that Dr. Comas-Espinal filled out on May 25, 2016, R. 322-27, he wrote "see copies," "MRI," and "x-rays" in response to a question asking him to "identify the imaging and diagnostic test results which support your diagnoses," R. 322. In the end, it is a close question as to whether the ALJ was obligated to attempt to obtain these records based on these vague statements. But because the case is already being remanded to develop the record, we direct the ALJ to make an effort to obtain from Dr. Comas-Espinal the "copies" he referred to in his questionnaire.

We reject, however, the claim that the ALJ is obligated to obtain more information from Dr. Comas-Espinal based on "the ALJ's perceived paucity of evidence" from Dr. Comas-Espinal. Pl. Mem. at 17. Other than the images, there is no indication that there are any "gaps" in Dr. Comas-Espinal's notes that need to be filled. See Rosa, 168 F.3d at 79 n.5. Rather, Dr. Comas-Espinal's notes frequently indicate that he saw Carela and prescribed medication without conducting a physical examination. See R. 422-27, 430, 433-54. Burgos v. Barnhart, 2003 WL 21983808, (S.D.N.Y. Aug. 20, 2003), which Carela cites for the proposition that the ALJ should have re-contacted Dr. Comas-Espinal to see if additional information was "readily available" before rejecting his opinion, Pl. Mem. at 17, is inapplicable. In that case, the record contained

only one page from a treating physician who provided an opinion, and also lacked any "laboratory or clinical findings or treatment notes" to support the treating physician's opinion. See Burgos, 2003 WL 21983808, at *15 (emphasis added). The court noted that "it is not clear from the record that the ALJ attempted to obtain any further information from [the treating physician] (such as his laboratory or clinical findings or treatment notes)." Id. Here, the record does contain Dr. Comas-Espinal's treatment notes, which include clinical findings when he performed a clinical assessment. See, e.g., R. 428. Accordingly, the ALJ did not err by declining to re-contact Dr. Comas-Espinal to obtain more information about the support for his opinion.

B.  The Treating Physician Rule

Carela argues that the ALJ failed to properly apply the treating physician rule by giving more weight to the opinion of consultative examiner Dr. Mescon over the opinion of treating physician Dr. Comas-Espinal. Pl. Mem. at 9-15. Because we remand this case for further development of the record, we do not address the merits of the parties' arguments as to the treating physician rule. Upon remand, the ALJ will reassess the weight each opinion is entitled to with the benefit of a more fully-developed record.

C.  The ALJ's Assessment of Carela's Credibility

Carela argues that the ALJ erred by failing to properly evaluate her credibility in determining how much weight to give to her allegations regarding the intensity, persistence, and limiting effects of her symptoms. Pl. Mem. at 18-20. Because we remand this case for further development of the record, we do not address the merits of the parties' arguments on this issue. The ALJ, on remand, is to make a new credibility determination in light of the more fully-developed record.

D.  Severity of Carela's Carpal Tunnel Syndrome

Carela argues that the ALJ erred by finding that her carpal-tunnel syndrome was "non-severe."  Pl. Mem. at 17-18.  In her decision, the ALJ states that "carpal tunnel syndrome was not diagnosed until May 2016," and that "[a] review of the record revealed no continuous 12 months of complaints regarding the use of [Carela's] hand."  R. 28.  The ALJ also noted that a note from May 2016 contained only "a generic description of carpal tunnel syndrome, not the claimant's own symptoms."  R. 28.  Without providing a citation to the record or other sources, the ALJ also observed that "the claimant should respond to treatment for carpal tunnel syndrome."  R. 28.  Carela argues that the record shows that her carpal tunnel syndrome was in fact diagnosed much earlier, Pl. Mem. at 18, pointing to a letter written by Dr. Comas-Espinal dated December 26, 2014, which states that Carela "is totally disabled at the present time due to her current medical condition," and listing the conditions of "Herniated Discs in the Lumbar Sacral Spine, Arthritis, and Carpal Tunnel Syndrome," R. 321.

Under the applicable regulations, an impairment is considered to be "non-severe" if it "does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1522(a), 416.921(a) (2017).[4]  In addition, an impairment must meet the "duration requirement," meaning that "it must have lasted or must be expected to last for a continuous period of at least 12 months," unless the "impairment is expected to result in death."  20 C.F.R. §§ 404.1509, 416.909.

Dr. Comas-Espinal's conclusory statement that Carela was "totally disabled," in part due

---

[4]  These regulations were amended by the SSA, effective March 27, 2017.  See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 F.R. 5844-01 (Jan. 18, 2017), 2017 WL 168819.  Because Carela's claim was filed before March 27, 2017, the old version of the regulations apply.  See id.

to her carpal tunnel syndrome alone does not constitute substantial evidence of the functional limitations caused by Carela's carpal tunnel syndrome. See, e.g., DiVetro v. Comm'r of Soc. Sec., 2008 WL 3930032, at *2 (N.D.N.Y. Aug. 21, 2008) ("Each finding as to the plaintiff's functional abilities must be supported by substantial evidence because 'conclusory statements regarding plaintiff's capacities are not sufficient.'") (quoting Verginio v. Apfel, 1998 WL 743706, at *3 (N.D.N.Y. Oct. 23, 1998)). Also, as the Commissioner notes, Def. Mem. at 14, a diagnosis alone is insufficient to deem an impairment severe. See Prince v. Astrue, 514 F. App'x 18, 20 (2d Cir. 2013); Bergeron v. Astrue, 2011 WL 6255372, at *3 (N.D.N.Y. Dec. 14, 2011) ("The mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment is not, itself, sufficient to deem a condition severe.") (internal quotation marks and citations omitted). And, of course, a treating physician's opinion as to whether or not a claimant is "disabled" is "not entitled to any weight, since the ultimate issue of disability is reserved for the Commissioner." Taylor v. Barnhart, 83 F. App'x 347, 349 (2d Cir. 2003); accord Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("the ultimate finding of whether a claimant is disabled and cannot work" is "reserved to the Commissioner") (internal quotation marks and citation omitted). The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform, see Poupore, 566 F.3d at 306; Perez, 77 F.3d at 46, and Carela has not pointed to substantial evidence in the record, at step two, to demonstrate that her carpal tunnel syndrome had "more than a minimal effect on [her] physical . . . ability[] to perform basic work activities" for a period of twelve months or more. See SSR 86-8. Certainly there was evidence in May and June 2016 regarding the effects of carpal tunnel syndrome. See R. 56, 60 (Carela's testimony in June 2016 that carpal tunnel syndrome caused pain, cramping in her hands, and made her unable to type or

22

open a jar, ); R. 418-19 (May 2016 nerve study diagnosing carpal tunnel syndrome).  Given the paucity of evidence as to the length of the condition, the ALJ did not err by concluding that the 12-month durational requirement was not met.

   E.   The ALJ's Application of the Medical-Vocational Rules

   At step five in the disability evaluation process, "the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform," and an "ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert."  McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014) (citation omitted); see Rosa,168 F.3d at 78 ("In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids).") (citations and internal quotation marks omitted).  The grid rules take into account a claimant's RFC, age, education, and work experience, and generally direct a finding of disabled or not disabled.  See 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a); accord Jimenez v. Berryhill, 2018 WL 4054876, at *3 (E.D.N.Y. Aug. 24, 2018).  "Before slotting a claimant into a particular grid rule, however, the ALJ must first determine whether the claimant is conversant and literate in English."  Lugo v. Chater, 932 F. Supp. 497, 501 (S.D.N.Y. 1996) (S.D.N.Y. 1996) (citing Vega v. Harris, 636 F.2d 900, 903-904 (2d Cir. 1981)); see also 20 C.F.R. §§ 404.1564(b)(5), 416.964(b)(5).

   Here, Carela challenges the ALJ's findings that she graduated high school, and that she was able to communicate and understand English, which in turn determined the grid guidelines used.  Pl. Mem. at 21-22.  While there was some back-and-forth about the subject during the hearing, substantial evidence does support the ALJ's finding that Carela has at least a high school education.  Initially, Carela testified that she completed twelfth grade, but did not

graduate high school. R. 50. Later on in the hearing, though, Carela stated to her attorney that she "did finish" high school "in the Dominican Republic," but that she did not know where her high school diploma was. R. 73. In addition, Carela indicated that she completed twelfth grade in her disability questionnaire. R. 252. Carela's statement during the hearing and her assertion in her questionnaire constitute substantial evidence that she completed high school, notwithstanding her initial statement that she did not graduate.

As to her language ability, the evidence suggesting that Carela can communicate in English cannot be fairly characterized as "more than a mere scintilla." Richardson, 402 U.S. at 401. The evidence in the record indicates that Carela navigated every step of the disability application process in Spanish or with the assistance of an interpreter. An interpreter translated the hearing into Spanish for Carela, see R. 44-45, and her consultative examination was conducted in Spanish, R. 315. The record includes copies of correspondence from the SSA in Spanish. R. 103-06, 111-12, 115-18, 123, 138-44, 152, 155, 167, 170, 175, 178, 182, 185, 190, 193, 197, 203-04, 207. While the ALJ characterized Carela's testimony as stating that she could read and write "a little" English, R. 35, the transcript reflects that her testimony was actually that she could read and write "[v]ery little" English. R. 50-51. The ALJ and the Commissioner point to records from Wadsworth Medical Group that indicate that Carela's preferred language is English. R. 35 (citing R. 422-24, 426); Pl. Reply at 10 (citing R. 422-24, 426). Both the ALJ and the Commissioner fail to note, however, that the page they omit from their cited page range indicates that Carela's preferred language is "Scandinavian languages," see R. 425, which is listed on several other occasions as her preferred language in her Wadsworth records, see R. 427, 428, 430, 431, 435. There are actually more entries indicating that her preferred language is "Scandinavian languages" than there are entries indicating that her preferred language is

24

"English." The majority of Carela's Wadsworth treatment records, though, indicate that her preferred language is Spanish. See R. 433, 434, 436-54. There is no assertion by anyone that Carela is conversant in "Scandinavian languages." In light of the repeated errors in the Wadsworth Medical Group's records system as to recording Carela's "preferred language," the few references to "English" do not constitute substantial evidence that she is "conversant and literate in English." Accordingly, upon remand the ALJ must not assume that Carela can communicate in English unless new evidence obtained supports a contrary finding.

IV. CONCLUSION

For the foregoing reasons, Carela's motion for judgment on the pleadings (Docket # 13) is granted in part and denied in part and the Commissioner's motion for judgment on the pleadings (Docket # 19) is granted in part and denied in part. This case is remanded to the Commissioner for further proceedings consistent with this opinion. The Clerk is requested to enter judgment.

SO ORDERED.

Dated: New York, New York
September 16, 2019

GABRIEL W. GORENSTEIN
United States Magistrate Judge

25